Opinion by Judge GRABER; Dissent by Judge KLEINFELD.
OPINION
GRABER, Circuit Judge:
Petitioner Earl Eugene Cannedy, Jr., stands convicted of committing lewd and lascivious acts upon his stepdaughter, and of attempting to dissuade her from reporting those acts to the police. The California state courts rejected Petitioner’s direct and collateral challenges to his conviction. Petitioner then filed a federal habeas petition under 28 U.S.C. § 2254, arguing that he had received ineffective assistance of counsel. After an evidentiary hearing, the district court granted the petition. We affirm.
FACTUAL AND PROCEDURAL HISTORY
A jury found Petitioner guilty of three counts of lewd acts upon a child, in violation of California Penal Code section 288(a), and one count of attempting to dissuade a witness from reporting a crime, in violation of California Penal Code section 136.1(b)(1). Those charges stemmed from allegations made by Petitioner’s stepdaughter, “A.G.”[1]
At trial, A.G. testified that Petitioner had molested her several times in the winter of 2003, when A.G. was 13 years old. According to A.G., the first incident occurred when Petitioner kissed and licked A.G. on the lips while she was wearing strawberry lip gloss. The next incident took place about one month later, in December 2003. A.G.’s mother, Pia, was at work, and Petitioner and A.G. were watching a movie in the living room. Petitioner offered to give A.G. a foot massage but then moved his hands up A.G.’s leg, under her clothes, to her vagina. He touched the inside of her vagina with his finger. A.G. then went to her room and fell asleep. In the morning, A.G. did not tell her mother about the incident because she was confused and scared.
A.G. testified that the next incident occurred approximately two weeks later. A.G. was ill and was lying on the couch in the family room. Petitioner offered to give A.G. a back massage, and she accepted his offer. During the massage, Petitioner moved his hands under her pajamas and slid her underwear and pajamas down. He then pulled her hips up and put his mouth to her vagina. A.G. started crying, *1152 and Petitioner stopped what he was doing, apologized, and told A.G. that it would never happen again. A.G. went to her room and, when her mother returned home, A.G. did not mention Petitioner’s behavior.
According to A.G., the final incident occurred on either Christmas day or the day after Christmas. On holidays, the children often joined Petitioner and his wife in their bed. A.G. went to her parents’ bedroom, joined her parents and two sisters on the bed, and fell asleep. When she awoke, her mother was in the shower. Petitioner slid his hands down A.G.’s pants to the top of her underwear but did not touch her vagina. A.G. got out of the bed and went to her room. She did not tell her mother about the incident.
A.G. testified that the first person she told about the molestation was her boyfriend, B.R. Approximately a week after the foot massage incident, A.G. told B.R. that Petitioner had touched her inappropriately. A.G. recalled that her boyfriend wanted her to “tell” but that she did not want to do so. After the last incident, A.G. went to the San Francisco Bay Area to visit family. While there, she told her cousin about the molestation, but did not tell her aunt.
After she returned from the Bay Area, in early January, A.G. told her best friend, “L.M.,” about Petitioner’s inappropriate behavior. L.M. wanted A.G. to tell an adult, but initially A.G. refused. That weekend or the next week, L.M.’s mother Melanie picked the girls up from the mall. A.G. told Melanie what Petitioner had done. Melanie took A.G. back to Melanie’s house and called Pia. Pia arrived shortly thereafter, and A.G. told her “everything that had happened.” Pia was shocked and left to speak with Petitioner. A few hours later, Pia returned. By that time, A.G. had become sick and had a headache, so Pia suggested that A.G. return home. At home, A.G. saw Petitioner but did not speak with him.
A few days later, A.G. went to the emergency room. Before leaving for the hospital, A.G. testified that Pia and Petitioner had a talk with her about the allegations that she had made. A.G. stated that Petitioner told her that “we should just keep it in the family and that it — it’s all over and it’ll never happen again, just to forget about it and not tell anyone that it happened.” A.G. further testified that Petitioner told her that if the police tried to speak with her about the molestation, she should deny that it had ever occurred. Petitioner said that if A.G. told the police, she and her sisters would be taken away and put in a foster home.
At the emergency room, A.G. spoke with several child protection agents and police officers. She denied being abused and said, “I love my step-dad. He’d never molest me, not in a million years.” The next day, A.G. spoke with two child protection agents and first denied, but then admitted, that Petitioner had molested her.
On cross-examination, the defense pointed out several inconsistencies between A.G.’s testimony at the preliminary hearing and her testimony at trial. Those inconsistencies included A.G.’s earlier testimony that Petitioner had never put a finger inside her vagina, as well as other inconsistencies about details surrounding the alleged incidents of molestation. The defense also highlighted A.G.’s close relationship with her mother and questioned why A.G. would accept Petitioner’s offer of a back massage and climb into bed with him after the first incident had allegedly occurred.
The prosecution called several witnesses to testify about what A.G. had told them, including B.R., L.M., Melanie, and Pia. Their testimony corresponded with the same basic narrative regarding A.G.’s dis *1153 closure of the molestation, but there were several inconsistencies among the various witnesses’ accounts. For example, B.R. repeatedly testified that, in early December 2003, A.G. had told him that Petitioner had warned her that she would be taken into custody by child protection services if she divulged the molestation. By contrast, A.G. testified that Petitioner had given her that warning in January 2004, right before she left for the emergency room. As another example, Melanie testified that when Pia returned from confronting Petitioner about A.G:’s allegations, Pia said that Petitioner had admitted the allegations and had assured Pia that he would sign over the house to her. Meanwhile, Pia testified that Petitioner had never admitted the allegations or offered to sign over the house and that she had told Melanie no such thing. Pia also testified that A.G. never directly told her that Petitioner had molested her.
The government also offered propensity evidence, admissible under California Evidence Code section 1108, concerning Petitioner’s alleged sexual assault of Pia’s sister, T.C. At the time of the trial, Petitioner had not been convicted of any crime related to that incident. Three government witnesses offered testimony regarding the alleged assault, and each of them provided a slightly different account of the incident. T.C. alleged that, while she was drunk, Petitioner had penetrated her vagina with a dildo. Pia and T.C.’s sister, Claire, testified that she received a call from Pia in which Pia stated that Petitioner was orally copulating with T.C. and asked Claire to come fetch T.C. from Pia’s house. Finally, Pia testified that she never saw Petitioner assault T.C., but instead asked Claire to pick up T.C. because T.C. was drunk and acting inappropriately.
Petitioner testified as the sole defense witness. He denied ever molesting A.G. He also denied assaulting T.C., providing an account of the 2000 incident that largely corresponded with Pia’s testimony. He hypothesized that A.G. might have harbored animosity toward him because he and Pia had planned to sell their house and move to Mountain Center, despite A.G.’s preference for living in the city. The defense theory of the case was that Petitioner was innocent and that A.G. had fabricated the allegations.
After seven days of testimony, the jury convicted Petitioner on three counts of lewd and lascivious conduct, but acquitted him of a fourth count, which pertained to Petitioner’s alleged licking of A.G’s lips. The jury also convicted Petitioner of attempting to dissuade A.G. from reporting the molestation to police and found true two special allegations of substantial sexual conduct with a minor under the age of 14. The trial court sentenced Petitioner to a term of 128 months’ imprisonment.
After trial, Petitioner hired a new lawyer. Petitioner then moved for a new trial, grounded in part on his trial lawyer’s alleged ineffective assistance of counsel. Specifically, Petitioner alleged that his trial lawyer, Mark Sullivan, “failed to present witnesses who could have corroborated [A.G.]’s motives for accusing [Petitioner] of molestation.” Petitioner pointed in particular to a handwritten statement submitted by one of A.G.’s friends, a copy of which he filed with his motion, that read:
The second week of February, I logged on the internet to talk to my friends. That day, I was talking to [A.G.], and I decided to look at her profile. To my surprize the profile said, “To everyone whos reading this, the rumers that you’ve heard are wrong. I just wanted to move to my dads because everyone hates me, and I don’t want to put up with it anymore. Everything you’ve heard isnt true. I just made it up, so I could get away from it all. Pm *1154 living at my dads where I have friends, and I am very happy. I’m at [L.’s house] right now, but I’m only going to be here for a day, so you can reach me at [L.’s house] if you want to talk.” Signed [J.C.]
It is with my permission that this information be used and it is true and correct.
Mother of [J.C.]: Jane [C.]
(Errors in original.) The trial court denied Petitioner’s motion for a new trial.
Petitioner appealed his convictions to the California Court of Appeal and, simultaneously, petitioned for a writ of habeas corpus from that court. In that petition, he raised the same ineffective assistance of counsel claim that he made in his motion for a new trial, and he requested an evidentiary hearing. As support for his claim, Petitioner submitted the handwritten statement that he had provided to the trial court. He also included with his petition a sworn declaration by J.C. It said:
I used to be one of [A.G.]’s best friends. I knew her for three and a half years, and knew her very well in those years.
Regarding the profile I alluded to in my statement that [Petitioner’s lawyer] attached in support of [Petitioner’s] motion for a new trial ..., it was a buddy profile for AIM ([America Online] instant messenger). I found it while I was on the Internet instant messaging my friends. I think it was on the Internet to tell all of her friends/aquaintences [sic] why she had moved, and why she wasn’t coming back.
In the profile, she stated that she made up the claims of molestation against [Petitioner] because she wanted to move to her natural father’s home in Northern California where she was more happy and had more Mends.
I would have testified at [Petitioner’s] trial but his trial attorney did not subpoena me to testify. He never even talked to me.
Petitioner also submitted an email from Sullivan, which stated that he had discussed with Petitioner “the strategic pros and cons of calling ... the many ... witnesses whose names [Petitioner and his wife] gave [to him].” The email went on to state, “it was agreed that [it] would not be to our advantage to call ... the ... prospective witnesses in the trial.”
The California Court of Appeal issued an unpublished opinion affirming Petitioner’s convictions and denying the writ. The court found Petitioner’s ineffective assistance of counsel claim “too vague to warrant habeas relief’ because “there is no allegation that trial counsel knew of the existence of [J.C.], the information on the Internet, or the time frame given for the alleged Internet information, and there is no documentary evidence.” The court also observed that, at trial, Petitioner testified that A.G. got upset when he and A.G.’s mother put their house up for sale because A.G. did not want to move. Thus, the court reasoned, the away message’s suggestion that A.G. wanted to move contradicted Petitioner’s own testimony. “Accordingly,” the court concluded, “we find that [Petitioner] cannot show either deficient representation or prejudice with regards to his [ineffective assistance of counsel claim].”
After the California Court of Appeal denied Petitioner’s appeal and petition, Petitioner filed a petition for review and a mostly duplicative petition for a writ of habeas corpus in the California Supreme Court. For the first time, Petitioner submitted his own declaration, stating:
Prior to my trial, I gave my trial lawyer, Mark Sullivan, names, addresses and phone numbers of all potential witnesses who could give favorable testimony in my behalf.
*1155 Prior to my trial, I specifically told Mr. Sullivan about [J.C.] who was a friend of [A.G.]. I indicated that she could give favorable testimony in my behalf as to a motive for [A.G.] to falsely accuse me of the crimes for which I was charged. Contrary to Mr. Sullivan’s assertion to my appellate attorney, I never agreed that there were no available witnesses who could give favorable testimony in my behalf. I was disappointed Mr. Sullivan did not call any of my witnesses to testify. I trust[ed that] he knew what he was doing.
The California Supreme Court summarily denied the writ and declined to review the court of appeal’s decision.
Petitioner then petitioned the district court for a writ of habeas corpus. The district court held an evidentiary hearing on Petitioner’s ineffective assistance of counsel claim. Six witnesses testified.
First, J.C. and her mother both testified that they saw the away message described in J.C.’s handwritten statement during the second week of February 2003. Thinking that it could be useful evidence, they wrote down the statement and gave it to A.G.’s mother. Second, A.G.’s mother testified that, before the trial, she gave Sullivan a copy of that statement in a box of other documents. She also testified that, during a meeting with Petitioner and Sullivan shortly before trial, she handed Sullivan a copy of the statement and Sullivan agreed to subpoena J.C. to testify. Petitioner’s former neighbor, present at that same meeting, corroborated that testimony, saying that the statement was discussed “intensely.”
Next, A.G. testified that she did not write the away message. She did not know who else could have written it because she could not recall giving anyone else the password to her America Online account and she had not stored her password in any computer to which anyone could have had access during the second week of February 2003.
Last, Sullivan testified that, three or four weeks before the trial, Petitioner mentioned a favorable posting that A.G. had made on the Internet. But Petitioner never could identify who saw it, and the issue eventually “seemed to fizzle.”
The district court disbelieved Sullivan, crediting the other witnesses instead. The court held that J.C.’s testimony concerning the away message was admissible under state law through California’s hearsay exception for prior inconsistent statements. The court also held that Sullivan’s conduct was constitutionally deficient because “[e]vidence that A.G. recanted her molestation allegations to her friends was so significant and potentially exculpatory that any reasonable attorney would have sought to admit the evidence.” The court concluded that Sullivan’s deficient performance prejudiced Petitioner, because J.C.’s testimony “would have permitted jurors reasonably to conclude, or at least reasonably to suspect, that: (1) [A.G.] fabricated her allegations of molestation; and (2) [A.G.] had a motive to fabricate those allegations because she wanted to move away. There exists a reasonable probability that such conclusion[s] or suspicion[s] would have raised in the mind of at least one juror a reasonable doubt as to Petitioner’s guilt.” The district court granted the writ, and the state timely appeals.
DISCUSSION
We review de novo the district court’s grant of habeas relief. McMurtrey v. Ryan, 539 F.3d 1112, 1118 (9th Cir. 2008). Because Petitioner filed this petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 governs review of his claims. James v. Ryan, 679 F.3d 780, 801 (9th *1156 Cir.2012), petition for cert. filed, 81 U.S.L.W. 3047 (U.S. June 28, 2012) (No. 12-11). AEDPA imposes a “highly deferential” standard of review and “demands that state-court decisions be given the benefit of the doubt.” Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).
A. Cullen v. Pinholster
As an initial matter, we must decide whether we may consider the evidence taken by the district court in analyzing Petitioner’s ineffective assistance claim. We conclude that we may not; our review is limited to the record that was before the California Supreme Court.
After the district court granted the petition, while this appeal was pending, the Supreme Court decided Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). There, the Court held that “review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.” Id. at 1398. Once a state court has decided the claim on the merits, “evidence later introduced in federal court is irrelevant to § 2254(d)(1) review.” Id. at 1400.
Here, the California Supreme Court adjudicated Petitioner’s ineffective assistance claim on the merits. First, the California Court of Appeal held that Petitioner had demonstrated neither deficient performance nor prejudice with respect to trial counsel’s failure to introduce evidence concerning the away message. Then the California Supreme Court summarily affirmed. Therefore, we “look through” the California Supreme Court’s decision to the last reasoned decision — that of the California Court of Appeal. James, 679 F.3d at 801. And we “treat[] the later [decision] as reaching the merits if the earlier one did.” Harris v. Thompson, 698 F.3d 609, 624 (7th Cir.2012), petition for cert. filed, 81 U.S.L.W. 3421 (U.S. Jan. 16, 2013) (No. 12-885); see also Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (“Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.”). Accordingly, in conducting our own review under § 2254(d), we must limit ourselves “to the record that was before the state court that adjudicated the claim on the merits”[2] — the California Supreme Court.[3] Id.
B. Ineffective Assistance
The state courts concluded that Petitioner had not demonstrated ineffective assistance of counsel. Under AEDPA,
[federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court’s decision “was contrary to” federal law then clearly established in the holdings of [the Supreme Court]; or *1157 that it “involved an unreasonable application of’ such law; or that it “was based on an unreasonable determination of the facts” in light of the record before the state court.
Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (citations omitted). “[C]learly established law” refers to “the holdings, as opposed to the dicta, of [the Supreme Court’s] decisions” at the time the state court decides the matter. Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir.2010) (internal quotation marks omitted) (alterations in original).
In evaluating the state’s denial of habeas relief, we must decide whether, considering only the evidence before the state court, the determination that Petitioner received constitutionally sufficient assistance of counsel was “an unreasonable application of[ ] clearly established Federal law” or resulted from an “unreasonable determination of the facts.” 28 U.S.C. § 2254(d). “Under the ‘unreasonable application’ clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
Review of ineffective assistance claims under § 2254(d)(1) of AEDPA is “doubly deferential.” Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). Unless there is a Supreme Court case directly on point, “relief may be granted only if the state-court decision unreasonably applied the more general standard for ineffective-assistance-of-counsel claims established by Strickland, in which [the Supreme Court] held that a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel.” Id. at 122, 129 S.Ct. 1411. “Stated simply, a federal habeas court making the ‘unreasonable application’ inquiry should ask whether the state court’s application of clearly established federal law was objectively unreasonable.” Williams, 529 U.S. at 409, 120 S.Ct. 1495. Thus, even if the state court arrived at what we think to be an incorrect result, that result must be upheld “so long as fairminded jurists could disagree on the correctness of the state court’s decision.” Richter, 131 S.Ct. at 786 (internal quotation marks omitted).
“To establish that counsel provided constitutionally ineffective assistance, a defendant must demonstrate both deficient performance and prejudice.” James, 679 F.3d at 807. If the state court reasonably concluded that Petitioner failed to establish either prong of the Strickland[4] test, then we cannot grant relief. Because the California Supreme Court summarily denied the petition, we must “look through” that judgment to the last reasoned state-court decision on the merits. James, 679 F.3d at 801. Here, the last reasoned decision is that of the California Court of Appeal.
The dissent argues that, after Richter, we should not “look through” a state high court’s summary denial of a habeas petition to evaluate the reasoning that a lower court offered for denying a claim. Instead, the dissent would have us evaluate all the hypothetical reasons that could have supported the high court’s decision. That view rests on an overly broad reading of Richter.
As this court has previously recognized, Richter addressed the effect of the California Supreme Court’s summary denial of an original petition for habeas corpus. *1158 Williams v. Cavazos, 646 F.3d 626, 635 (9th Cir.2011), cert granted, — U.S. -, 132 S.Ct. 1088, 181 L.Ed.2d 806 (2012). “The question in Richter arose because state habeas petitions in, California are presented to the state supreme court as original petitions, rather than as. requests for review of lower-court rulings denying relief....” Id. at 635-36. In Richter, there was no reasoned decision by a lower court; there was no reasoned decision at all. 131 S.Ct. at 783. There was only a “one-sentence summary order” denying Richter’s habeas petition. Id. In those circumstances, the United States Supreme Court held that “it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary,” id. at 781-85, and that a federal habeas court “must determine what arguments or theories ... could have supported! ] the state court’s decision, ” id. at 786 (emphasis added). The Seventh Circuit has likewise recognized the limitation of Richter’s holding. See Woolley v. Rednour, 702 F.3d 411, 422 (7th Cir.2012) /“/Richter ] addressed a scenario where a conviction was upheld by a summary affirmance of the California Supreme Court. There was no ‘reasoned opinion’ by any lower court on collateral review. By its terms, /Richter ] applies ‘[wfhere a state court’s decision is unaccompanied by an explanation....’ 131 S.Ct. at 781.” (third alteration in original)). Accordingly, it does not follow from Richter that, when there is a reasoned decision by a lower state court, a federal habeas court may no longer “look through” a higher state court’s summary denial to the reasoning of the lower state court.
The dissent correctly identifies Ylst, 501 U.S. 797, 111 S.Ct. 2590, as the origin of the “look through” doctrine but fails to appreciate that the doctrine applies, even after Richter, outside its original context. “Although the Court in Ylst was concerned with determining whether the state court had lifted a procedural bar to a claim by reaching the merits, the doctrine that a federal habeas court reviews the last reasoned state decision has been extended beyond the context of procedural default.” Barker v. Fleming, 423 F.3d 1085, 1092 n. 3 (9th Cir.2005). In fact, it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is “contrary to” or “an unreasonable application of’ clearly established federal law. See, e.g., Mason v. Allen, 605 F.3d 1114, 1119 n. 2 (11th Cir.2010) (per curiam); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir.2010); Gonzales v. Mize, 565 F.3d 373, 379 (7th Cir.2009); Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir.2008); Mark v. Ault, 498 F.3d 775, 783 (8th Cir.2007); Wood v. Quarterman, 491 F.3d 196, 202 (5th Cir.2007); Joseph v. Coyle, 469 F.3d 441, 450 (6th Cir.2006); Bailey v. Roe, 339 F.3d 1107, 1112-13 (9th Cir.2003). But see Tice v. Johnson, 647 F.3d 87, 106 (4th Cir.2011) (“Tice cites no instances of our having previously applied the ‘look through’ rule of Ylst where a state procedural bar is not at issue, and we have discovered none ourselves. We shall not embark on that journey today.”).
We think it unlikely that the Supreme Court intended to disrupt this practice without making its intention clear. Moreover, we have continued, since Richter, to examine the last reasoned decision. In Williams, we explained the distinction between summary denials on the merits and summary denials of discretionary review. 646 F.3d at 635-36. Because denials of discretionary review are not decisions on the merits, we held that Richter does not affect our practice of “looking through” summary denials of discretionary review to the last reasoned state-court decision. Id. at 636. But we intimated the possibility that Richter may affect our practice of *1159 looking through summary denials on the merits. See id. at 635 (“Following the Supreme Court’s decision in [Richter ], we continue to adhere to [the] practice [of ‘looking through’ summary denials], at least with respect to cases in which state courts of last resort have exercised their discretionary authority to deny petitions for review.” (emphasis added)). A few months after Williams, we “looked through” a summary denial that apparently would have functioned as a denial on the merits under Richter had there been no reasoned state decision, and we examined the last reasoned decision. See Hurles v. Ryan, 706 F.3d 1021, 1038 (9th Cir.2013) (“We focus our inquiry on [the] denial of Hurles’s second [petition for post-conviction review], [because it] is the last reasoned decision by the state court on the judicial bias claim.”).
In sum, we conclude that Richter does not change our practice of “looking through” summary denials to the last reasoned decision[5] — whether those denials are on the merits or denials of discretionary review. And, even if Richter does require us to consider hypothetical reasons that may reasonably support the California Supreme Court’s decision here, our review of the record discloses none that are consistent with that record.
1. Deficient Performance
The court of appeal rejected Petitioner’s claim of deficient performance for several reasons. First, the court observed a number of evidentiary deficiencies in Petitioner’s filing, namely that “there [was] no allegation that trial counsel knew of the existence of [J.C.], the information on the Internet, or the time frame given for the alleged Internet information, and there [was] no documentary evidence.” Second, the court of appeal noted that the away message’s intimation that A.G. wanted to leave town would have contradicted Petitioner’s statement that A.G. did not want to move to the mountains with Petitioner and A.G.’s mother.
The critical inquiry under § 2254(d) is whether, in light of the evidence before the California Supreme Court — the last state court to review the claim — it would have been reasonable to reject Petitioner’s allegation of deficient performance for any of the reasons expressed by the court of appeal. See Richter, 131 S.Ct. at 786 (“Under § 2254(d), a habeas court must determine what arguments or theories supported ... the state court’s decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.”); Frantz v. Hazey, 533 F.3d 724, 738 n. 15 (9th Cir.2008) (en banc) (noting that we must focus our analysis “on state courts’ actual reasoning rather than hypothetical alternative lines of analysis”). The court of appeal first noted that “there [was] no allegation that trial counsel knew of the existence of [J.C.].” That deficiency was corrected by the addi *1160 tional evidence that Petitioner submitted to the California Supreme Court; he submitted his own sworn declaration stating that he “specifically told Mr. Sullivan about [J.C. and] ... indicated that she could give favorable testimony in my behalf as to a motive for A.G. to falsely accuse me.” Accordingly, it was unreasonable for the California Supreme Court to reject Petitioner’s claim on that ground.
The court of appeal also was incorrect when it stated that there was no time frame given for the away message. J.C.’s declaration plainly recites that she saw the away message during the second week of February. Thus, that part of the court of appeal’s reasoning rested on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2).
Nor could the statement that no documentary evidence supported Petitioner’s claim have justified the conclusion that his allegations of ineffective assistance were “without merit.” Under California law, a habeas petition “should both (i) state fully and with particularity the facts on which relief is sought, as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.” People v. Duvall, 9 Cal.4th 464, 37 Cal. Rptr.2d 259, 886 P.2d 1252, 1258 (1995) (emphasis added) (citations omitted). That passage suggests that declarations constitute “documentary evidence” that can support a petitioner’s habeas claim. Thus, considering the evidence before the California Supreme Court, Petitioner supported his claim with documentary evidence, including his own declaration and J.C.’s declaration.
Even if the declarations submitted by Petitioner were “testimonial,” rather than “documentary,” evidence, that fact alone would not support the state courts’ denial of Petitioner’s ineffective assistance claim. See Black’s Law Dictionary 640 (9th ed.2009) (defining “testimonial evidence” as “[a] person’s testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness”). In evaluating Petitioner’s claim, the state courts had to determine whether the allegations contained in the petition, viewed in the context of the trial record, established a prima facie case of ineffective assistance of counsel. See Pinholster, 131 S.Ct. at 1402 n. 12 (“The parties agree that the state-court record includes both the allegations of [the] habeas corpus petition ... and ... ‘any matter of record pertaining to the case.’ Under California law, the California Supreme Court’s summary denial of a habeas petition on the merits reflects that court’s determination that ‘the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.’ It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations and will also ‘review the record of the trial ... to assess the merits of the petitioner’s claims.’ ” (internal quotation marks and citations omitted) (alterations in original)).
In Petitioner’s submissions to the California Supreme Court, he made several important factual, not conclusory, allegations, including: (1) that J.C. saw an away message, written by A.G., retracting the accusations against Petitioner; (2) that Petitioner told trial counsel that J.C. could testify as to A.G.’s motive to accuse Petitioner falsely; and (3) that trial counsel failed to interview J.C. Those allegations are not contradicted by anything in the trial record, and they are supported by declarations from Petitioner and J.C.
The question for the state court, then, was whether those allegations sufficed to establish a prima facie case of ineffective assistance. See In re Harris, 5 Cal.4th 813, 21 Cal.Rptr.2d 373, 855 P.2d 391, 397 *1161 (1993) (“[O]ne seeking relief on habeas corpus need only file a petition for the writ alleging facts which, if true, would entitle the petitioner to relief.”). The court of appeal clearly concluded that they did not, because it refused to grant Petitioner an evidentiary hearing and apparently declined to issue an order to show cause. See Duvall, 37 Cal.Rptr.2d 259, 886 P.2d at 1258 (“If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause].”). But the mere fact that Petitioner did not introduce, for example, a printout of the away message, does not mean that his allegations, if taken as true, failed to establish a prima facie case. And, as discussed below, the court of appeal’s concerns about the sufficiency of those allegations were unreasonable.
The court of appeal concluded that Petitioner had not demonstrated ineffective assistance because: (1) Petitioner did not establish that he told his trial lawyer about the away message and (2) even if he had, the lawyer reasonably could have refused to introduce the message because it conflicted with part of Defendant’s testimony. Under § 2254(d)(1), we must ask whether it would have been an unreasonable application of federal law for the state court to conclude, on those two grounds, that trial counsel did not perform deficiently. The Strickland standard is, itself, already deferential, requiring courts to “apply a ‘strong presumption’ that counsel’s representation was within the ‘wide range’ of reasonable professional assistance.” Richter, 131 S.Ct. at 787. Review of the deficient performance prong under § 2254(d)(1) is therefore “doubly” deferential. Id. at 788.
Here, the court of appeal correctly observed that Petitioner did not allege that he told trial counsel about the existence of the away message. But Petitioner did allege that “I specifically told Mr. Sullivan about [J.C.] who was a friend of [A.G.] I indicated that she could give favorable testimony in my behalf as to a motive for [A.G.] to falsely accuse me of the crimes for which I was charged.” Thus, even assuming that trial counsel was not aware of the existence of the away message, the question is whether there is a reasonable argument that counsel’s failure to contact J.C. at all did not amount “to incompetence under ‘prevailing professional norms.’ ” Id.
No such reasonable argument exists. According to Petitioner’s declaration, he told his lawyer that J.C., a friend of A.G.’s, could provide information about A.G.’s motive for falsely accusing Petitioner. Petitioner’s trial was largely a “he said, she said” case, with no physical evidence linking Petitioner to the alleged abuse. Furthermore, Petitioner was the only witness to testify in his defense, and the defense’s theory of the case was that A.G. had fabricated the allegations. Evidence that A.G. had a motive to implicate Petitioner falsely thus would have been vital to Petitioner’s defense and consistent with the defense strategy. No competent lawyer would have declined to interview such a potentially favorable witness when that witness had been clearly identified, the witness was easily accessible and willing to provide information, and trial counsel faced a dearth of defense witnesses. On this record, counsel’s failure to interview J.C. and to call her as a witness therefore cannot be excused as strategic. See Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (noting that trial counsel’s “failure to call [the witness] cannot be excused as a tactical decision because [counsel] did not have sufficient information with which to make an informed decision”), petition for cert. filed, 81 U.S.L.W. 3292 (U.S. Sept. 19, *1162 2012) (No. 12-371); Cornell v. Ryan, 539 F.3d 938, 951 (9th Cir.2008) (“Counsel’s ineffective assistance ... cannot be excused as strategic. He failed to conduct an investigation sufficient to make an informed judgment. To the extent that his decisions reflected any tactical considerations, his approach ... cannot be considered an objectively reasonable strategy, even when viewed under the highly deferential Strickland standard.”); Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006) (“Although trial counsel is typically afforded leeway in making tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision.”).
The court of appeal’s final remaining ground for rejecting Petitioner’s allegation of deficient performance is that, even if trial counsel knew about the existence of the away message, he may have declined to present it because it contradicted some of Petitioner’s testimony. But in his petition for review in the California Supreme Court — filed simultaneously with a petition for habeas corpus' — Petitioner easily explained why there was no conflict between the away message and his testimony: “that [A.G. did not want] to move to Mountain Center did not mean that what she said on the Internet was not true. She might have preferred where she was living over moving to the mountains but still wanted to move to Northern California for the reasons [J.C.] indicated.” That clarification illuminates that there was, in fact, no conflict — a child might not want to move away from home to go live in town X with one parent while still wanting to move away to live in town Y with the other parent. Given that plausible explanation and the extremely high exculpatory value of the away message, it was objectively unreasonable to conclude that Petitioner’s trial lawyer rendered effective assistance by declining to investigate or to introduce that evidence.
2. Prejudice
As noted, to prevail on his ineffective assistance claim, Petitioner must demonstrate prejudice as well as deficient performance.
In assessing prejudice under Strickland, the question is not whether a court can be certain counsel’s performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel’s actions more likely than not altered the outcome, but the difference between Strickland’s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.
Richter, 131 S.Ct. at 791-92 (internal quotation marks and citations omitted).
The California Court of Appeal rejected Petitioner’s claim of prejudice, stating, “we find that [Petitioner] cannot show either deficient representation or prejudice with regards to his fourth claim of ineffective assistance.” (Emphasis added.)[6] Thus, we turn to the question whether the state court’s finding of no prejudice constituted an “objectively unreasonable” application of Strickland.[7] Williams, 529 U.S. at 409, 120 S.Ct. 1495.
*1163 “To determine whether counsel’s errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately.” Thomas, 678 F.3d at 1102 (internal quotation marks omitted). The government argues that it was reasonable to conclude that Petitioner was not prejudiced by counsel’s failure to introduce evidence of the away message because that evidence was inadmissible under state law. Thus, we must first consider whether evidence of the away message could have been admitted at trial. If the evidence could have been admitted, we must then ask whether there was a reasonable probability that it would have affected the outcome of the proceeding.
For the away message to have a reasonable probability of affecting the outcome of the trial, there had to be a reasonable probability that a competent lawyer would have introduced evidence of the away message in an admissible form. Wiggins v. Smith, 539 U.S. 510, 535-36, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); see also Riley v. Payne, 352 F.3d 1313, 1323 (9th Cir.2003) (considering the prejudicial effect of failure to introduce testimony where it was “probable” that such testimony was admissible under state evidence law). It does not matter whether the evidence would necessarily have been admissible in the specific form in which it was presented to the state courts on appeal or post-conviction review. What matters is whether a competent lawyer would have been able to introduce the evidence, in some form, at trial. See Wiggins, 539 U.S. at 535, 123 S.Ct. 2527 (“[W]e find there to be a reasonable probability that a competent attorney, aware of this [evidence], would have introduced it at sentencing in an admissible form.”).
By contrast, a failure to introduce evidence that is clearly inadmissible cannot be prejudicial, because there is no chance that the jury ever would have heard that evidence. See Houston v. Schomig, 637 F.3d 976, 980 (9th Cir.) (“The district court agreed with [trial counsel] that the polygraph results were not admissible without a joint stipulation. He noted that the prosecutor would not have consented. Thus, no adverse effect can be attached to this alleged failure.”), cert. denied, — U.S. -, 132 S.Ct. 297, 181 L.Ed.2d 180 (2011); Stanley, 598 F.3d at 620 (“No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial.”). But that is not the situation here.
A competent lawyer likely would have been able to introduce the disputed evidence, the away message, in an admissible form. Both parties concede, and we agree, that the substance of the away message would fall under the prior inconsistent statement exception to California’s hearsay rule. See Cal. Evid.Code § 1235 (“Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.”). The only question, then, is whether there is a reasonable probability that a competent lawyer would have been able to lay a foundation for the evidence.
Under California law, the bar for laying such a foundation is low. California Evidence Code section 403[8] provides that, to lay a foundation, trial counsel would have *1164 had to produce additional evidence “sufficient to permit the jury to find [that A.G. wrote the away message] by a preponderance of the evidence.” People v. Hinton, 37 Cal.4th 839, 38 Cal.Rptr.3d 149, 126 P.3d 981, 1020 (2006); see also People v. Marshall, 13 Cal.4th 799, 55 Cal.Rptr.2d 347, 919 P.2d 1280, 1297 (1996) (“[T]he trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence, even if the court personally would disagree.” (emphasis added) (citations omitted)).
There is a reasonable probability that a competent lawyer would have been able to produce evidence sufficient to permit a jury to find, by a preponderance of the evidence, that A.G. wrote the away message. J.C.’s declaration establishes from personal knowledge that the away message appeared on A.G.’s America Online Instant Messenger account. Competent counsel could have interviewed J.C. to find out what she knew about A.G.’s use of instant messaging (including whether the style, grammar, and spelling of the away message were similar to those in A.G.’s other away messages); questioned Pia, Petitioner, and A.G. about A.G.’s use of instant messaging and whether her account was password protected; and determined whether A.G. had been staying “at [L.’s house]” when the away message was posted. The conclusion that such foundational evidence was available is bolstered by the fact that, at trial, Pia alluded to A.G.’s extensive use of an instant messaging account. Thus, there is a reasonable probability that a competent lawyer would have introduced evidence of the away message in an admissible form.
Once introduced, the evidence of the away message would have been the cornerstone of Petitioner’s case. The message was powerful evidence that A.G. had fabricated her allegations of abuse. She stated that she “just made [the allegations of abuse] up, so [she] could get away from it all.” It is difficult to imagine any evidence that could have been more exculpatory for Petitioner than the alleged victim’s broad recantation of her accusations. Furthermore, at trial, the government introduced no physical evidence linking Petitioner to the abuse of A.G., and there were significant inconsistencies in the government witnesses’ testimony. Meanwhile, Defendant served as the lone defense witness. The away message thus would have provided critical corroboration for Defendant’s testimony and would have severely undermined the prosecution’s case on the molestation charges.
*1165 Counsel’s failure to introduce evidence of the away message also was prejudicial with respect to Petitioner’s conviction for attempting to dissuade A.G. from testifying, because it went to the heart of A.G.’s credibility. A.G. provided the only testimony from personal knowledge that Petitioner had attempted, in January 2004, to dissuade her from reporting the molestation to police. Pia’s account of that conversation, at which she was present, differed from A.G.’s in that Pia testified that Petitioner never told A.G. not to tell the police about the molestation. Petitioner also testified that he did not warn A.G. not to tell police or admonish her that she and her sisters could be sent to a foster home. Finally, the government’s case on this count already suffered from inconsistencies between A.G’s testimony and that of her boyfriend regarding the time frame for the alleged dissuasion. A.G.’s boyfriend testified that A.G. had told him, in December 2003, that Petitioner attempted to dissuade her from telling anyone about the molestation. But, by A.G.’s account at trial, Petitioner did not attempt to dissuade her until January 2004. The away message thus would have corroborated the defense’s theory that A.G. was not a credible witness and that her account of Petitioner’s actions and statements could not be trusted. Accordingly, a reasonable probability exists that, had the away message been admitted, at least one juror would have found Petitioner not guilty of the dissuasion charge.[9]
The dissent identifies two “problems” that Petitioner has in demonstrating prejudice: that a jury might not believe J.C. about what she saw on the Internet and that they might not believe A.G.’s recantation. Thus, the dissent argues thaf a fair-minded jurist could have concluded that putting J.C. on the stand probably would not have made a difference. But that argument sidesteps the critical question in determining prejudice: whether a fair-minded jurist could fail to acknowledge at least a reasonable probability of a different outcome. “Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel’s actions more likely than not altered the outcome.... ” Richter, 131 S.Ct. at 792 (internal quotation marks and citation omitted). In a “he said, she said” case, such as this, it would have been objectively unreasonable not to acknowledge that both outcomes had a reasonable probability of occurring.
In sum, the state court’s conclusion that Petitioner received constitutionally sufficient assistance of counsel constituted an “objectively unreasonable” application of the Strickland standard. Williams, 529 U.S. at 409, 120 S.Ct. 1495. The *1166 state court’s determination that counsel’s performance was not deficient rested on unreasonable grounds, and no reasonable argument supports the state court’s determination that Petitioner suffered no prejudice.
Having concluded that the state court’s decision was unreasonable, we “review the substantive constitutionality of the state custody de novo” to determine whether Petitioner suffered a constitutional violation entitling him to relief under § 2254(a). Frantz, 533 F.3d at 736-37. Largely for the reasons discussed above, we conclude that Petitioner received ineffective assistance of counsel. First, trial counsel performed deficiently. The defense theory of the case was that A.G. had fabricated her allegations. Defense counsel knew that J.C. could provide A.G.’s motive for doing so. Competent counsel would not have failed to interview such a potentially important witness or to introduce the significant exculpatory evidence that she could have provided. Second, counsel’s deficient performance prejudiced Petitioner. It was reasonably likely that a competent lawyer could have introduced evidence of the away message in an admissible form. The prosecution’s case rested on the jury’s believing A.G.’s allegations, and its case was already weakened by inconsistencies in the government witnesses’ testimony. Thus, had evidence of the away message been admitted, it was reasonably likely that at least one juror would have credited that evidence and concluded that a reasonable doubt existed as to whether A.G. fabricated her allegations. Accordingly, there is a reasonable probability that, but for trial counsel’s deficient performance, the outcome of the trial would have been different. Petitioner’s claim therefore meets the Strickland standard for ineffective assistance of counsel, and his petition for relief must be granted.
AFFIRMED.

. We use the initials, rather than the names, of minors throughout this opinion. 18 U.S.C. § 3509(d); see also United States v. Begay, 673 F.3d 1038, 1040 n. 4 (9th Cir.) (en banc) ("Because the victims were minors, we refer to them using only their initials.”), cert. denied, — U.S. -, 132 S.Ct. 754, 181 L.Ed.2d 508 (2011).

. We need not decide whether, under Gonzalez v. Wong, 667 F.3d 965 (9th Cir.2011), cert. denied, - U.S. -, 133 S.Ct. 155, 184 L.Ed.2d 234 (2012), we could stay and abey this case to allow Petitioner to present his additional evidence in state court. As we discuss below, even on the record before the state courts, Petitioner is entitled to relief.

. Although the California Court of Appeal also adjudicated the claim on the merits, it would make little sense to confine our review to the record that was before that court, especially where, as here, the record before the California Supreme Court was materially improved, in accordance with state law. Assuming that the California Court of Appeal’s decision was correct on the record before it, confining our review to that record would produce the anomalous result of upholding an erroneous decision by the California Supreme Court on a fuller record because an inferior court’s decision was correct on a less-developed record.

. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. The dissent also faults us for testing the reasonableness of the California Court of Appeal's decision by evidence that was before the California Supreme Court but was not before the Court of Appeal. But that is not what we are doing. We are reviewing the reasonableness of the California Supreme Court’s decision by the evidence that was before it, and we are using the Court of Appeal’s reasoning in accordance with our usual practice of "looking through” summary denials to the last reasoned decision. See Hurles, 2013 WL 219222, at *3, *12 ("looking through” a summary affirmance to examine the last reasoned decision by a state court). Had the state supreme court intended different reasoning because of the newly added facts, the court could have provided it. Although we recognize that the particular procedural history of this case makes it unusual, there is nothing “odd” about our adhering to our case law.

. The federal district court concluded that "[t]he state courts did not reach the issue of Strickland prejudice.” Cannedy v. Adams, No. EDCV 08-1230, 2009 WL 3711958, at *31 (C.D.Cal. Nov. 4, 2009) (unpublished). That conclusion is incorrect.

. Because the state court of appeal's reasons for rejecting Petitioner's claim of prejudice *1163 are unclear, we have elected to treat the state court’s prejudice determination as if it were unaccompanied by an explanation. Accordingly, we apply the stringent standard imposed by Richter and ask whether there is "any reasonable argument” that Petitioner was not prejudiced by counsel’s deficient performance. 131 S.Ct. at 788.

. California Evidence Code section 403 states:
(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary *1164 fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when:
(1) The relevance of the proffered evidence depends on the existence of the preliminary fact;
(2) The preliminary fact is the personal knowledge of a witness concerning the subject matter of his testimony;
(3) The preliminary fact is the authenticity of a writing; or
(4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself.
(b) Subject to Section 702, the court may admit conditionally the proffered evidence under this section, subject to evidence of the preliminary fact being supplied later in the course of the trial.
(c) If the court admits the proffered evidence under this section, the court:
(1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.
(2) Shall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists.

. Furthermore, to obtain a conviction under California Penal Code section 136.1(b)(1), the government must demonstrate that the person whom the defendant attempted to dissuade was the victim of a crime. See People v. Upsher, 155 Cal.App.4th 1311, 66 Cal.Rptr.3d 481, 488 (2007) ("To prove a violation of section 136.1, subdivision (b)(1), the prosecution must show (1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report of their victimization to any peace officer or other designated officials.”); Cal.Crim. Jury Instruction 2622 (providing model jury instructions that include as an element of the offense that the person the defendant allegedly sought to influence was a crime victim). The statute defines a "victim” as "any natural person with respect to whom there is reason to believe that any crime ... is being or has been perpetrated or attempted to be perpetrated.” Cal.Penal Code § 136(2). Accordingly, to convict Petitioner under section 136.1(b)(1), the government had to demonstrate that A.G. was a victim. As discussed above, there is a reasonable probability that the evidence of the away message would have created at least a reasonable doubt as to whether A.G. had indeed been victimized by Petitioner.